IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 30, 2008

Charles R. Fulbruge III
Clerk

No. 07-20191

ROBIN HAGAN

Plaintiff-Appellant

v.

ECHOSTAR SATELLITE, L.L.C. & ECHOSPHERE, L.L.C.

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS and SOUTHWICK, Circuit Judges, and DRELL, District Judge.[*]

DRELL, District Judge:

Plaintiff-Appellant Robin Hagan ("Hagan") appeals from the district court's grant of judgment as a matter of law in favor of the defendants-appellees, Echostar Satellite, L.L.C. and Echosphere, L.L.C. (collectively, "Echostar"), following the district court's declaring a mistrial after the jury was unable to come to a verdict at the conclusion of a trial on the merits. For the reasons set forth below, we affirm.

---

[*] District Judge of the Western District of Louisiana, sitting by designation.

I.

This case arises from Echostar's termination of Hagan's employment on January 11, 2005. The relevant facts are not in dispute. In 2000, Hagan began his employment with Echostar, a satellite television company, as a technician responsible for installing satellite dishes for customers in Houston, Texas. Although Hagan acknowledges that he occasionally violated company policies in minor ways, e.g., by tardiness, Echostar continued to employ and promote him. After working as a technician for nearly four years, in March of 2004 Hagan was promoted to the position of field service manager, and as part of the new position, he was placed in charge of a small group of technicians. Hagan directly reported to Trina Robinson, an installation manager; Robinson reported to Patrick Morrow ("Morrow"), the general manager; and Morrow reported to Elizabeth Miller, a regional manager located in Colorado.

In December of 2004, Hagan attended a managers' meeting at which Morrow explained to the attendees an upcoming change to the technicians' work schedule. Under the schedule as it existed to that time, each week was divided into two four-day shifts of ten-hour workdays: Sunday through Wednesday and Wednesday through Saturday. Because the two four-day shifts overlapped on Wednesdays, two technicians were assigned to a single vehicle on those days, rather than each technician having his own vehicle as on every other day. Under the old schedule, technicians' workdays often exceeded ten hours, so they earned a considerable amount of overtime pay, often up to one full day of extra pay per two-week pay period.

Under the new schedule, technicians would work a total of seven twelve-hour workdays (each with a mandatory thirty-minute lunch break) over each two-week pay period. This was accomplished with two rotating shifts: a four-day Sunday through Wednesday shift and a three-day Thursday through Saturday shift. At the managers' meeting, Morrow explained that Echostar's objective in

implementing the new schedule was to remove the inefficiencies created by the Wednesday overlap and to improve customer service. When some managers, including Hagan, raised questions and concerns regarding the potential decrease in overtime pay for the technicians and the way the technicians might react, Morrow assured the managers that eight hours of overtime pay were built into the new schedule as part of the four-day shift in each two-week period. Although the managers were instructed to keep the schedule change a secret until it was officially announced, they were told by Echostar that when the time came, they were to explain Echostar's stated reasons to the technicians and to assure them that the change was not designed to reduce their overtime pay. The managers were also supposed to emphasize the positive, such as the extra day off during each two-week pay period.

On January 5, 2005, Morrow officially announced the new schedule during an all-team meeting attended by both managers and technicians. Morrow fielded a limited number of questions from the technicians and instructed them to speak to their designated field service manager if they had further questions. Later that day, a few of Hagan's technicians asked him whether their overtime pay would be decreased under the new schedule, and Hagan told them that it would. At least one of the technicians asked if the change was legal, though Hagan could not remember the exact content or wording of the question. Hagan admits that the calculation of his technicians' overtime hours was part of his job as field service manager; that he knew that his technicians were not legally entitled to overtime hours; that he had told his technicians they could not depend on overtime pay; that he did not think Echostar had done anything illegal; and that he had not personally questioned the legality of the schedule change. Nevertheless, he asked the Human Resources Manager, Eric Love ("Love"), to speak with the technicians who had asked the legal question. Rather than stay around to listen to Love's conversation with those technicians, Hagan

moved on to field another technician's questions. Although he did not hear Love's answer, he believed that it was satisfactory based on the technicians' reaction. That was the only relevant question regarding the legality of the schedule change.

On January 9, 2005, at a meeting with his technicians, Hagan was again asked by his technicians whether the schedule change would reduce their overtime hours. He again told them that it would, but he did emphasize that Echostar was making the change to eliminate the inefficiencies caused by the old schedule's overlapping Wednesday schedule. On January 10, 2005, Morrow and Hagan had an unscheduled meeting at which Morrow primarily discussed Hagan's poor work performance. Morrow also criticized the way Hagan had presented the schedule change to his technicians.

On January 11, 2005, Morrow called Hagan into his office and, in Love's presence, informed him that he was being terminated, effective immediately, for lack of performance. Love added that Hagan should have addressed his technicians' questions personally rather than getting Love to do so, even if Hagan had to wait until he could speak to Love. Hagan was also told that he should have better presented the schedule change to his technicians.

Although the only reason for termination stated on January 11, 2005 was lack of work performance, Echostar later listed insubordination as an additional reason. Hagan points to a series of documents and e-mails, not discussed by the district court, concerning morale problems caused by Hagan's conduct and apparently related to the insubordination charge. An e-mail by Morrow on the day of Hagan's termination stated, "[Hagan] stated to [the technicians] that the reason for the new shifts was to eliminate overtime, so they are in an uproar." There is also an undated file memo by Morrow, probably authored on the date of Hagan's termination or soon afterward, that speaks of the possibility of

Hagan's technicians seeking "outside representation" as a result of the way Hagan presented the schedule change's impact on their overtime pay.

On February 15, 2005, Hagan filed suit against Echostar in the United States District Court for the Southern District of Texas, stating as his only claim a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. Specifically, Hagan claimed that he was engaged in protected activity under 29 U.S.C. § 215(a)(3) and that Echostar's terminating him constituted unlawful retaliation. A four-day jury trial was held on February 5 through 8, 2007. At the close of Hagan's case, Echostar moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50, but the district court reserved ruling. At the close of all the evidence, but before the case was submitted to the jury, Echostar renewed its Rule 50 motion. The district court again reserved ruling and submitted the case to the jury.

During deliberations, the jury submitted several questions to the district court concerning the jury instructions, particularly the scope of protected activity under Section 215(a)(3), but the jury was ultimately unable to come to a verdict, describing the proceeding as "hopelessly deadlocked" in its final note to the court. The district court then declared a mistrial and informed the parties that it would rule on Echostar's pending Rule 50 motion. On February 16, 2007, in an unpublished memorandum and order, the district court granted judgment as a matter of law in favor of Echostar. Hagan v. Echostar Satellite L.L.C., No. H-05-1365, 2007 WL 543441 (S.D. Tex. Feb. 16, 2007). Hagan now appeals from that judgment.

II.

The primary inquiry in this appeal is whether the district court appropriately granted judgment as a matter of law in favor of Echostar pursuant to Fed. R. Civ. P. 50.[1] We have previously explained the standard of review for the grant or denial of a motion for judgment as a matter of law as follows:

> We review a district court's ruling on a Rule 50(a) motion for judgment as a matter of law de novo. Resolution Trust Corp. v. Cramer, 6 F.3d 1102, 1109 (5th Cir. 1993). Under this standard, we view all of the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion." Id. (citation omitted). A district court may not grant a Rule 50(a) motion "unless a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fitzgerald v. Weasler Engineering, Inc., 258 F.3d 326, 337 (5th Cir. 2001). This court reviews a jury's verdict for sufficiency of the evidence by determining whether
>
>> reasonable and fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions.... A mere scintilla is insufficient to present a question for the jury.... However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.
>
> MacArthur v. Univ. of Tex. Health Ctr. at Tyler, 45 F.3d 890, 896 (5th Cir. 1995) (citation omitted).

---

[1] Hagan also argues that the district court's jury instructions were in error. However, because we find that the district court properly granted judgment as a matter of law, any arguments concerning the jury instructions are moot. Sullivan v. Rowan Co., 952 F.2d 141, 149 (5th Cir. 1992) (citing Matherne v. Wilson, 851 F.2d 752, 762 (5th Cir. 1988)). This is especially true in light of the prior declaration of a mistrial. Consequently, we need not address the standard of review for jury instructions.

> According to Rule 50(b) of the Federal Rules of Civil Procedure, it is well-settled that a motion for directed verdict or judgment as a matter of law made at the close of the plaintiff's case-in-chief must be renewed at the close of [all the] evidence in the case. Id. (citing McCann v. Texas City Refining, Inc., 984 F.2d 667, 671 (5th Cir. 1993)).

Delano-Pyle v. Victoria County, Tex., 302 F.3d 567, 572 (5th Cir. 2002).

### III.

We first address Hagan's argument that a conflict in substantial evidence precludes the grant of judgment as a matter of law. That contention lacks merit. Most significantly, Hagan points to no potentially relevant facts that were not already considered by the district court, except for a file memo mentioning "outside representation" and other management correspondence concerning Hagan's presentation of the schedule change to his technicians. As we discuss in Part VII of this opinion, those documents do not affect the outcome of this case. Thus, the district court did not omit any relevant material facts from its opinion.

Next, Hagan argues that we should infer a conflict in substantial evidence from the fact that the jury was deadlocked in this case, but there are two reasons that argument must fail. First, the proper grant of a judgment as a matter of law makes the submission of the case to the jury irrelevant.[2] Second, even if we were to look to the jury deliberations for guidance in this case, the clarification questions asked by the jury suggest a dispute over the law rather than the facts. The jury's first note asked whether an employee "need[s] to be aware of and/or mention the FLSA when bringing the issue to management for it to be considered a protected activity," while the second note simply stated, "We cannot agree on what

---

[2] Sullivan, 952 F.2d at 149.

constitutes protected activity and so cannot determine if the actions of the plaintiff were a complaint covered by the statute." In short, there is nothing in the record to suggest a genuine conflict in substantial evidence, and therefore nothing to preclude judgment as a matter of law.

IV.

We now arrive at the heart of the controversy. Hagan's only claim is that Echostar retaliated against him in violation of the anti-retaliation provisions of the FLSA for personally objecting to the field technicians' schedule change because of a potential decrease in overtime pay and for passing along his technicians' question regarding the legality of the change to the Human Resources department. Because Hagan's entire suit rests on the FLSA, he may achieve protected status only if he was engaged in protected activity as set out by 29 U.S.C. § 215, which provides, in relevant part:

> (a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person–
>
> * * *
>
> (3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee; * * *

Id.

Because it is undisputed that, at the time of Hagan's discharge, he had not "instituted or caused to be instituted any proceeding," had not been linked to testimony in such a proceeding, and had not been involved on an

8

industry committee, Hagan's entire claim turns on whether or not his behavior constitutes filing a complaint under Section 215(a)(3). If Hagan did file a complaint, then he was engaged in protected activity under the FLSA, and we should reverse the district court's grant of judgment as a matter of law in favor of Echostar. If Hagan did not file a complaint, then he was not engaged in protected activity, his termination did not violate the FLSA, and we should affirm.

V.

Hagan asserts that the district court improperly applied the framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) in its memorandum and order granting judgment as a matter of law.[3] Although McDonnell Douglas was a Title VII case, the burden-shifting framework established therein has been adapted and applied to cases under the Age Discrimination in Employment Act ("ADEA")[4] and the FLSA.[5] As set out by the district court below, the framework is applied as follows in the context of a FLSA claim:

> First, a plaintiff must make a prima facie showing of (1) participation in protected activity under the FLSA; (2) an adverse employment action; and (3) a causal link between the activity and the adverse action. If a plaintiff meets this burden, the defendant must then articulate a legitimate, non-discriminatory reason for its decision. The burden then shifts to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination.

---

[3] Hagan v. Echostar Satellite L.L.C., No. H-05-1365, 2007 WL 543441, at *4 (S.D. Tex. Feb. 16, 2007).

[4] See, e.g., Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141-42 (2000); Palasota v. Haggar Clothing Co., 342 F.3d 569 (5th Cir. 2003) (per curiam).

[5] Kanida v. Gulf Coast Medical Personnel LP, 363 F.3d 568, 575 n.5 (5th Cir. 2004).

Hagan v. Echostar Satellite L.L.C., No. H-05-1365, 2007 WL 543441, at *4 (S.D. Tex. Feb. 16, 2007) (citations omitted).

Hagan argues that the district court erred in applying that framework in its analysis rather than addressing the ultimate question of whether discrimination occurred. Indeed, there is precedent holding that after a full trial on the merits, a district court must look at whether the plaintiff had presented sufficient evidence to allow a jury to arrive at a verdict, i.e., whether the plaintiff has met his ultimate burden of proving discrimination or retaliation (depending on the statute at issue), rather than simply focusing on the plaintiff's prima facie case.[6] This Circuit has phrased the question for the jury as "the ultimate question of whether a defendant took the adverse employment action against a plaintiff because of . . . protected status."[7]

However, both the prima facie case and the "ultimate question" in this matter depend on the issue of whether Hagan had "filed a complaint" under Section 215(a)(3). That issue was correctly the focus of the district court's memorandum and order. Succinctly, if Hagan cannot prove that he was engaged in protected activity under Section 215(a)(3), then he cannot make out a viable claim under the FLSA. In effect, Hagan's failure to make out a prima facie case automatically decides the "ultimate question." The district

---

[6] See, e.g., Palasota, 342 F.3d at 574 (5th Cir. 2003) (per curiam) (citing Scott v. Univ. of Mississippi, 148 F.3d 493, 504 (5th Cir. 1998)); Kanida, 363 F.3d at 575 (citing Powell v. Rockwell Int'l Corp., 788 F.2d 279, 285 (5th Cir. 1986)); Thomas v. Texas Dept. of Criminal Justice, 220 F.3d 389, 394 (5th Cir. 2000) (citing Baltazor v. Holmes, 162 F.3d 368, 373 (5th Cir. 1998) (citing, in turn, Harrington v. Harris, 118 F.3d 359, 367 (5th Cir. 1997))). We note that each of these cited cases involved a jury verdict in the plaintiff's favor, whereas the instant case ended in a hung jury and the district court's declaring a mistrial.

[7] Kanida, 363 F.3d at 576 (citing Walther v. Lone Star Gas Co., 952 F.2d 119, 127 (5th Cir. 1992) and Olitsky v. Spencer Gifts, Inc., 964 F.2d 1471, 1478 (5th Cir. 1992)).

court's error in speaking about the prima facie case rather than the "ultimate question"—if indeed that was an error[8]—is harmless.

---

[8] In U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711 (1983), involving a Title VII bench trial, the Supreme Court reasoned that the McDonnell Douglas burden-shifting analysis drops out (i.e., the district court should examine the "ultimate question," in our phrasing) when, inter alia, "the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case." Id. at 714. In Aikens, the district court had previously denied the defendant's motion for judgment as a matter of law, which the Supreme Court interpreted to be a ruling that the plaintiff had made out a prima facie case. Id. at 714 n.4. In the instant case, the district court had merely reserved ruling on Echostar's prior motions for judgment as a matter of law and so had not yet addressed Echostar's arguments regarding Hagan's prima facie case.

VI.

This Circuit has never addressed the exact contours of protected activity under Section 215(a)(3) in the context of filing a complaint, so the district court looked to other courts that have addressed the issue for guidance. In this effort, the district court found that even an informal, internal complaint could constitute protected activity under the FLSA. Hagan, 2007 WL 543441, at *4. Next, the district court found that Hagan could not recover under the FLSA unless he "stepped out of his role as an Echostar field service manager, either to complain to his employer in behalf of the technicians, or in his own behalf, about a supposed violation or irregularity under or related to the FLSA." Id. Third and finally, the district court found that the FLSA protects employees engaged in otherwise protected activity if that employee possesses a good faith belief that the employer had violated the law. Id. at *5.

The district court ultimately determined that Hagan's actions did not rise to the level of an informal complaint, because there was "no evidence that [Hagan] at any point crossed the line from acting in his appointed capacity as a field service manager in behalf of the company to acting in an adversarial role against Echostar." Id. Moreover, the district court noted that Hagan lacked a good faith belief that Echostar had violated the law in implementing the schedule change. Thus, the district court held, Hagan had failed to present any evidence that he had engaged in protected activity under Section 215(a)(3), and Echostar was entitled to judgment as a matter of law.

We address each of the three rules relied upon by the district court: the "informal complaint" rule; the "stepping outside the role" rule; and the "good faith" rule.

## VI(A)

The district court correctly noted the majority interpretation of Section 215(a)(3) is that even an informal, internal complaint may constitute protected activity:

> This Court has followed the majority position that an employee's informal complaint to his employer may constitute protected activity under Section 215(a)(3). See Dearmon v. Tex. Migrant Council, Inc., 252 F.Supp.2d 367, 367-68 (S.D. Tex. 2003) (Kazen, J.); Truex v. Hearst Commc'ns, Inc., 96 F.Supp.2d 652, 665-66 (S.D. Tex. 2000) (Rosenthal, J.); see also, e.g., Lambert v. Ackerley, 180 F.3d 997, 1003-05 (9th Cir. 1999) (en banc); Valerio v. Putnam Assocs., Inc., 173 F.3d 35, 44-45 (1st Cir. 1999); EEOC v. Romeo Comty. Schs., 976 F.2d 985, 989-90 (6th Cir. 1992); EEOC v. White & Son Enters., 881 F.2d 1006, 1011 (11th Cir. 1989); Brock v. Richardson, 812 F.2d 121, 124-25 (3d Cir. 1987); Love v. Re'Max of Am., Inc., 738 F.2d 383, 387 (10th Cir. 1984); Brennan v. Maxey's Yamaha, Inc., 513 F.2d 179, 181 (8th Cir. 1975). But see Lambert v. Genesee Hosp., 10 F.3d 46, 55 (2d Cir. 1993) (requiring the filing of a formal complaint with a government agency). At the same time, however, not all "abstract grumblings" or vague expressions of discontent are actionable as complaints. Lambert, 180 F.3d at 1007; Valerio, 173 F.3d at 44.

Hagan, 2007 WL 543441, at *4.

The "informal complaint" interpretation is not the only one. For example, in Lambert v. Genesee Hospital, cited by the district court as contrary authority, the Second Circuit stated that "[t]he plain language of [Section 215(a)(3)] limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor." Lambert, 10 F.3d at 55 (citing Romeo, 976 F.2d at 990 (Surheinrich, J., dissenting)). We do not read Section 215(a)(3) so narrowly as the Lambert court. Section 215(a)(3) speaks of an employee "fil[ing] any complaint," and we cannot agree that the plain language is limited to filing a formal complaint.

We adopt the majority rule, which allows an informal, internal complaint to constitute protected activity under Section 215(a)(3), because it better captures the anti-retaliation goals of that section. We also accept that there are necessary qualifications to the majority rule. For instance, as the district court also noted, "not all 'abstract grumblings' or vague expressions of discontent are actionable as complaints." Hagan, 2007 WL 543441, at *4. Thus, although Section 215(a)(3) allows informal complaints to constitute protected activity, the only immediate effect here is that Hagan's anti-retaliation claim is not automatically precluded because he did not filed a formal complaint. We must still determine whether he actually filed an informal complaint.

The circumstances that may constitute an informal complaint under the FLSA have included an employee's "outburst following her refusal to take part in what she thought was an unlawful scheme"[9]; the fact that an employee "complained to the school district of unlawful sex discrimination and had told them she believed they were 'breaking some sort of law' by paying her lower wages than previously paid to male temporary custodians"[10]; the complaints of female employees to a co-owner of the employer and to a foreman "about the unequal pay" despite the absence of a formal EEOC complaint at the time of retaliatory discharge[11]; and sending a memo requesting a pay raise to the president of the employer with an attached copy of the Equal Pay Act.[12]

---

[9] Brennan, 513 F.2d at 180.

[10] Romeo, 976 F.2d at 989.

[11] White & Son Enters., 881 F.2d at 1011.

[12] Love, 738 F.2d at 384, 386.

It is clear these cases require the informal complaint to concern some violation of law. Here, Hagan personally voiced internal objections and concerns to management about the possibility of field technicians receiving less overtime pay. However, he did not frame any of his objections in terms of the potential illegality of the change. Hagan admits that he did not think the change was illegal, and it is undisputed that the change was in fact legal. Thus, Hagan's personal objections to the schedule change do not constitute protected activity under the FLSA. The only remaining issue is whether Hagan's passing along the field technicians' questions about the legality of the schedule change to Human Resources Manager Love—without staying to listen to Love's answer—constitutes an informal complaint. The resolution of that question depends on whether the district court's formulation of the "stepping outside the role" requirement is correct.

VI(B)

Relying primarily on McKenzie v. Renberg's Inc., 94 F.3d 1478 (10th Cir. 1996), the district court found that an employee does not file a complaint under Section 215(a)(3) unless that employee somehow steps outside of his normal job role. In McKenzie, the Tenth Circuit explained the "stepping outside the role" requirement as follows:

> Despite our expansive interpretation of § 215(a)(3), we have never held that an employee is insulated from retaliation for participating in activities which are neither adverse to the company nor supportive of adverse rights under the statute which are asserted against the company. . . . [I]t is the assertion of statutory rights (i.e., the advocacy of rights) by taking some action adverse to the company—whether via formal complaint, providing testimony in an FLSA proceeding, complaining to superiors about inadequate pay, or otherwise—that is the hallmark of protected activity under § 215(a)(3).

Here, McKenzie never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint about the wage and hour practices of her employer and asserting a right adverse to the company. McKenzie did not initiate a FLSA claim against the company on her own behalf or on behalf of anyone else. Rather, in her capacity as personnel manager, she informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations. In order to engage in protected activity under § 215(a)(3), the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA. Here, McKenzie did none of these things. Indeed, McKenzie testified that her job responsibilities included participating in wage and hour issues. There is no evidence in the record to suggest that McKenzie was asserting any rights under the FLSA or that she took any action adverse to the company; rather, the record reflects that McKenzie's actions in connection with the overtime pay issue were completely consistent with her duties as personnel director for the company to evaluate wage and hour issues and to assist the company in complying with its obligations under the FLSA. McKenzie therefore lacks an essential ingredient of a retaliation claim; that is, she did not take a position adverse to her employer or assert any rights under the FLSA. Accordingly, McKenzie did not engage in activity protected under § 215(a)(3) . . . .

Id. at 1486-87 (footnote omitted).

We find the logic of McKenzie to provide a correct and balanced approach in requiring an employee to "step outside his or her role of representing the company by either filing (or threatening to file) an action adverse to the employer, by actively assisting other employees in asserting FLSA rights, or by otherwise engaging in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA."

Id., 94 F.3d at 1486-87. This rule is eminently sensible for management employees like Hagan, because a part of any management position often is acting as an intermediary between the manager's subordinates and the manager's own superiors. The role necessarily involves being mindful of the needs and concerns of both sides and appropriately expressing them. Voicing each side's concerns is not only not adverse to the company's interests, it is exactly what the company expects of a manager.

If we did not require an employee to "step outside the role" or otherwise make clear to the employer that the employee was taking a position adverse to the employer, nearly every activity in the normal course of a manager's job would potentially be protected activity under Section 215(a)(3). An otherwise typical at-will employment relationship could quickly degrade into a litigation minefield, with whole groups of employees—management employees, human resources employees, and legal employees, to name a few—being difficult to discharge without fear of a lawsuit. For those reasons, we agree that an employee must do something outside of his or her job role in order to signal to the employer that he or she is engaging protected activity under Section 215(a)(3).

Of course, whether an employee has "stepped outside the role" depends on what that role is and whether special circumstances are present. For instance, in York v. City of Wichita Falls, Tex., 944 F.2d 236 (5th Cir. 1991), also cited by the district court and discussed by both parties at oral argument, a fire department battalion chief "showed the Fire Chief a memo discussing Garcia [v. San Antonio Metro Transit Authority, 469 U.S. 528 (1985)] and asked if the fire fighters were due any overtime pay under Garcia."[13]

---

[13] York, 944 F.2d at 238.

The battalion chief was both a public employee of the fire department and the president of the International Association of Fire Fighters, Local 2186.[14] The district court and the Fifth Circuit both agreed that this act constituted an assertion of FLSA coverage, which was deemed to fall within Section 215(a)(3) under a note to Section 215 added by the Fair Labor Standards Amendments of 1985, § 8, relating solely to public agencies.[15] Because York relied on the "asserted coverage" language of that statutory note, it is not directly applicable to our inquiry here concerning whether Hagan "filed a complaint." Yet the York court's rationale is informative:

> The district court construed the assertion of coverage language as nothing more that a notice requirement. However, such a liberal construction is not consistent with the plain language of § 8. Because § 8 prohibits an employers' retaliatory acts because an employee asserts coverage, the employee must take some actions which a reasonable employer would consider an assertion that employees are entitled to the overtime pay or other benefits conferred by the FLSA.

---

[14] Id.

[15] Id. at 237, 241; Pub. L. No. 99-150, § 8, 99 Stat. 791. The note provides in full:

Liability of Public Agency for Discrimination Against Employee for Assertion of Coverage

Pub.L. 99-150, § 8, Nov. 14, 1985, 99 Stat. 791, provided that: "A public agency which is a State, political subdivision of a State, or an interstate governmental agency and which discriminates or has discriminated against an employee with respect to the employee's wages or other terms or conditions of employment because on or after February 19, 1985, the employee asserted coverage under section 7 of the Fair Labor Standards Act of 1938 [section 207 of this title] shall be held to have violated section 15(a)(3) of such Act [subsec. (a)(3) of this section]. The protection against discrimination afforded by the preceding sentence shall be available after August 1, 1986, only for an employee who takes an action described in section 15(a)(3) of such Act [subsec. (a)(3) of this title]."

29 U.S.C. § 215 note (West 2008) (Historical and Statutory Notes) (alterations in original).

> The evidence indicated that Broyles asked the Fire Chief if the fire fighters were entitled to overtime pay because of the Supreme Court's decision in Garcia. This inquiry, if proved on remand, could constitute a reasonable assertion of coverage.

York, 944 F.2d at 241 (internal citation omitted).

There are at least two major ways that York is distinguishable. First, of course, York took place within a public agency, and the case was decided under a specific public agency amendment to the FLSA that is not at issue in this case. Second, and more relevant, the employee making the assertion of rights in York was also the president of the union. Under a McKenzie analysis, although the battalion chief may not necessarily have stepped outside his role as an employee when speaking up on behalf of the fire fighters, his role as president of the local chapter of the fire fighters union automatically placed him in a position at least partially adverse to the fire department.[16] A union president, even if also an internal manager, is a special case. Thus, York does not apply to the situation before us, where there was no evidence that Hagan was either a union representative or otherwise had any role adverse to the company. Hagan was simply a typical Echostar manager.

Based on the above analysis, the essence of the inquiry, properly formulated by the district court, is whether Hagan "stepped out of his role as an Echostar field service manager, either to complain to his employer in behalf of the technicians, or in his own behalf, about a supposed violation or irregularity under or related to the FLSA." Hagan, 2007 WL 543441, at *4. As explained above, the only remaining issue is whether Hagan's asking

---

[16] The battalion chief "was not a casual commentator or busy body. He was a union leader for the fire fighters and reasonably should have been viewed as a spokesman for the fire fighters as a whole." York, 944 F.2d at 241.

Human Resources Manager Love to answer his technicians' unspecified legal question constitutes protected activity under Section 215(a)(3). The district court found that

> there is no evidence of conduct by Hagan that reasonably could or should have been construed or understood by the employer as a positive assertion of rights against Echostar under or related to the FLSA either in Plaintiff's behalf or in behalf of the technicians. The evidence is uncontroverted that Plaintiff as a field service manager sought help to compensate for his own perceived sense of inability correctly to answer questions in behalf of Echostar, and at no time in his encounter with Love did Plaintiff say or do anything that would constitute even an informal complaint by Plaintiff against his employer or a departure from his duties as a field service manager representing the company over to a role as an advocate for the technicians voicing a complaint to the company.

Id., at *6.

Given the undisputed facts before the district court, its determination on this issue is legally correct. There is nothing in the facts to suggest that Hagan was personally advocating on behalf of his technicians' statutory rights. Although Hagan clearly did care about the size of his technicians' paychecks, he admittedly did not believe that their legal question had any merit. In fact, he took so little evident interest in his technicians' legal question that he did not inform himself of the answer or even stay around to listen to Love's answer. In short, there was nothing in Hagan's behavior to suggest that he had taken a position adverse to the company with respect to his technician's statutory rights. Hagan did not "step outside the role" of manager in passing along his technicians' legal question and so did not engage in protected activity under Section 215(a)(3).

VI(C)

Because we have already ruled that Hagan failed to file a complaint, and thus to engage in protected activity under Section 215(a)(3), we need not address either the district court's analysis of or Hagan's objection to the so-called good faith rule, under which an employee's good faith belief that the employer has committed a FLSA violation may give rise to protected activity, even though the employer has committed no such violation.[17]  Considering that Hagan's failure to engage in protected activity precludes recovery on his sole claim under the FLSA's anti-retaliation provision, the good faith rule is irrelevant to the outcome of this case, and we decline to address it.

---

[17] Hagan, 2007 WL 543441, at *6 (citing, inter alia, Sapperstein v. Hager, 188 F.3d 852, 857 (7th Cir. 1999) and Love v. Re/Max of Am., Inc., 738 F.2d 383, 387 (10th Cir. 1984)).

VII.

We do address one final point of contention. Hagan suggests that the management documents created in connection with his termination, particularly the file memo mentioning the possibility of Hagan's technicians seeking "outside representation," are enough, standing alone, to constitute retaliation in violation of the FLSA. Two circuits have permitted a retaliation claim premised on an employer's erroneous belief that an employee had engaged in protected activity. See Brock v. Richardson, 812 F.2d 121, 125 (3d Cir. 1987) ("[W]e conclude that a finding that an employer retaliated against an employee because the employer believed the employee complained or engaged in other activity specified in [Section 215(a)(3)] is sufficient to bring the employer's conduct within that section."); Saffels v. Rice, 40 F.3d 1546, 1550 (8th Cir. 1994) (adopting Brock's interpretation in holding that the FLSA "protects employees who are discharged based on their employer's mistaken belief that they reported violations or otherwise engaged in protected activity.").

Hagan had not engaged in protected activity, and the documents that Hagan points to do not indicate that the company believed Hagan himself had sought a lawyer or taken other arguably protected actions. It is unnecessary for us to agree or disagree with the Third and Eighth Circuits on this issue; even under their interpretation, the reference in the file memo does not create a legally sufficient evidentiary basis to find for Hagan on the issue.

VIII.

For the foregoing reasons the district court's Rule 50 grant of judgment as a matter of law in favor of the defendants-appellees, Echostar Satellite, L.L.C. and Echosphere, L.L.C., is affirmed.

AFFIRMED.