# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-41341

United States Court of Appeals
Fifth Circuit

**FILED**
February 24, 2017

Lyle W. Cayce
Clerk

LEANN STARNES,

Plaintiff - Appellant

v.

MICHAEL G. WALLACE; MICHAEL A. RICH; DONNA RICH; SHERRI
CUNNINGHAM; DONNA MAREZ; DAYBREAK PARTNERS, L.L.C.;
DAYBREAK VENTURE, L.L.C.; DAYBREAK HEALTHCARE,
INCORPORATED; DAYBREAK THERAPY, L.L.C.; HEA MANAGEMENT
GROUP, INCORPORATED; COLD SPRING HOLDINGS, L.L.C.; CANYON
RIVER HOLDINGS, L.L.C.; DENTON RIVER HOLDINGS, L.L.C.; SEVEN
FALLS HOLDINGS, L.L.C.; RED PINE HOLDINGS, L.L.C.,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before DAVIS, SOUTHWICK, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

The Fair Labor Standards Act (FLSA), passed during the New Deal to
set a federal minimum wage for certain workers, is one of the earliest federal
statutes to contain the antiretaliation provisions that in the years since have
become common in employment laws (the contemporaneous National Labor
Relations Act is another early example).  The plaintiff brought this case
contending that the antiretaliation provision was violated when she was

No. 15-41341

terminated after raising concerns about whether a coworker's pay complied with the FLSA. We decide whether there is sufficient evidence in support of her claim to reach a jury. We also consider whether a Texas statute dealing with health facilities prohibits retaliation for reporting FLSA violations.

## I.

LeAnn Starnes worked at Daybreak Ventures, L.L.C., a company that employs thousands of individuals to work at nursing homes in Texas.[1] Starnes was a Risk Manager in the corporate office, which involved investigating work-related injuries and reviewing any liability for the company, providing information to the Texas Workforce Commission, reviewing and denying work-related injury claims, working on the opposition statements for EEOC discrimination cases, and attending mediation for lawsuits when they involved the Risk Management Department.

Sometime in late October or early November of 2010, coworker Ludy Estrada complained to Starnes that Daybreak was not paying Estrada's husband Vincent, a maintenance worker, for his travel time or overtime. Although Starnes reviewed the information Ludy[2] provided, she referred Ludy to Andy Shelton who was the Director of Human Resources because Starnes believed FLSA claims were handled exclusively by his department. Ludy refused to speak to Shelton, expressing concern that she might lose her job if she reported the violation. Starnes then met with Shelton herself on Ludy's behalf. During the meeting, which took place just a few days after Ludy had approached Starnes, Starnes told Shelton that Daybreak was "violating the

---

[1] Because of the summary judgment stance, this recitation takes facts in the light most favorable to Starnes.

[2] We refer to the Estradas by first name because both Ludy and Vincent are mentioned throughout the opinion.

2

law by the way [it was] paying Vincent."

Before New Year's, Daybreak President Mike Rich pulled Starnes aside to discuss Vincent's situation. Starnes again reiterated that "it looked to [her] like Daybreak was breaking the law" by the way it was paying Vincent. Rich assured her that they would resolve the situation.

The sequence of the events that followed is disputed, but around this time, Daybreak began requiring each employee to sign a job description. Starnes's own "Job Description" was dated October, 25, 2010, but she did not sign it until March 11, 2011. According to this document, Starnes was required to report "all allegations and findings related to violations of Federal and State law including Anti-Kickback and fraud." This differs from an earlier "Job Analysis" of Starnes's position, which appears to be written by Starnes herself and describes the amount of time she spent on various duties, none of which involved reporting violations of law.

Daybreak also began reclassifying maintenance workers like Vincent Estrada from salaried employees to hourly ones who are covered by the FLSA. Despite the reclassification, Vincent's claim for backpay remained unresolved for most of 2011. Moreover, Daybreak was still not paying Vincent for his travel time.

In November 2011, Ludy became frustrated that Vincent's claim still had not been resolved. She went to Shelton, the HR Director, and demanded that Vincent be paid. Shelton asked her to put the request in writing so that it could be presented to Rich. The Estradas ultimately requested $68,713.38 in owed wages, and Shelton told Ludy that he would relay the request to Rich. On December 9, 2011, Rich called Ludy into his office to talk about the amount

of Vincent's request.[3]  Starnes, who had not had any involvement with the pay dispute in the year since she had reported it to HR and discussed it with Rich, was not present.  Yet Rich indicated during the negotiations that he believed that Starnes "was to blame" for the problems with Vincent's wage claim.  The discussion between Rich and Ludy became "heated" because they disagreed as to whether the law required payment for Vincent's travel time.  The conversation was so loud that Starnes could overhear Rich's angry raised voice from her own office.  After Ludy became visibly upset during the meeting, Rich agreed to resolve Vincent's claim and assured Ludy that she would not lose her job.  The last week of 2011, Daybreak finally settled its dispute with Vincent for $40,000.

Just ten days later, on January 6, 2012, Daybreak laid off five employees, including Starnes and Ludy, purportedly due to financial difficulties related to cuts in Medicaid reimbursement rates.  Yet one of these employees, Rich's son, had already accepted another position with a different company before being "let go."  Two other employees were soon rehired in different positions within Daybreak.

The two who were left without a job, Starnes and Ludy, then filed this lawsuit asserting claims for retaliation under both the FLSA and section 260A.014(b) of the Texas Health and Safety Code, which regulates nursing homes.  Daybreak filed a 12(b)(6) motion that sought dismissal of the state law claim and also sought a ruling that damages for emotional distress and punitive damages are not available under the FLSA retaliation provision.  The district court granted that motion in full.

---

[3] Starnes's affidavit states that this meeting took place in December 2012, but given that it clearly indicates that Starnes was still working there at the time and that it was before the 2011 holidays, it is apparent that she meant to say December 2011.

No. 15-41341

After discovery, Daybreak moved for summary judgment on liability under the FLSA.  The district court denied the motion with respect to Ludy.  It found that she had established a prima facie case of retaliation and that a jury could conclude that the "cost cutting" justification for her termination was pretextual primarily because she and Starnes were the only employees who wanted to stay, but were "permanently let go" as a result of the supposed downsizing.  The district court reached a different result as to Starnes, finding that she could not establish a prima facie case for two reasons.  First, it concluded she did not engage in protected activity because she did not act outside her job duties in reporting the wage dispute.  Second, it concluded that she could not establish causation because more than a year elapsed between her reporting activity and termination.

Ludy settled with Daybreak before trial.  Starnes timely appealed all of the district court's rulings except the one about punitive damages.

## II.

We begin with our *de novo* review of the district court's summary judgment ruling on the FLSA retaliation claim, viewing the evidence "in the light most favorable to the non-moving party."  *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012).  We will affirm summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

As with most federal employment statutes that require a showing of improper motive for which direct evidence is usually lacking, courts evaluate FLSA retaliation claims relying on circumstantial evidence under the evidentiary framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008).  The first question is whether Starnes has made a prima facie showing of: (1) participation in a protected activity under the FLSA; (2) an adverse

No. 15-41341

employment action; and (3) a causal link between the activity and the adverse action. *Id.* If she has, the burden then shifts to Daybreak to articulate a legitimate, nonretaliatory reason for the adverse action. *Id.* Once it has done so, then the burden shifts back to Starnes to identify evidence from which a jury could conclude that Daybreak's proffered reason is a pretext for retaliation. *Id.*

## A.

As to Starnes's prima facie case, the parties do not dispute that her termination was an adverse action, but they disagree about the protected activity and causal link elements.

To engage in protected activity, the plaintiff must make a "complaint." *Hagan*, 529 F.3d at 626. We have held that:

> In order for an employee's communication to constitute a "complaint," the "employer must have fair notice that an employee is making a complaint that could subject the employer to a later claim of retaliation" and the "complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection."

*Lasater v. Tex. A & M Univ.-Commerce*, 495 F. App'x 458, 461 (5th Cir. 2012) (per curiam) (quoting *Kasten v. Saint–Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1334–35 (2011)). We have also explained that such an assertion of rights requires that an employee step outside of his normal job role and assert a right adverse to the company.[4] *Hagan*, 529 F.3d at 627. Because a

---

[4] The Ninth Circuit has held that *Kasten* requires a slightly different standard than the "manager rule" used in *Hagan*. *Rosenfield v. GlobalTranz Enters, Inc.*, 811 F.3d 282, 287–88 (9th Cir. 2015). The Ninth Circuit thus requires that the plaintiff's complaint be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten*, 131 S. Ct. at 1335. However, it has acknowledged that its rule, which treats the plaintiff's job duties as "one consideration" in determining whether an employee

manager's job duties often include "being mindful of the needs and concerns of both sides and appropriately expressing them" when it comes to pay issues, merely voicing such concerns does not constitute sufficient notice that the manager is asserting rights. *Id.* at 628.

We thus refused to find that a manager of satellite television technicians acted adversely to his employer when he asked an HR Manager to speak with technicians who had raised questions about the legality of new pay practices. *See Hagan*, 529 F.3d at 629–30. The *Hagan* manager never advocated on behalf of his or other technician's statutory rights. He did not even think there was any unlawful policy and was so uninterested in the matter that he did not attend the meeting HR had with the technicians or otherwise follow up with HR to determine whether the change was, in fact, legal. *Id.* at 629–30.

Starnes's communications went much further than that of the field service manager in *Hagan*. She did not merely relay concerns of others that Daybreak's actions might be illegal; instead she asserted on at least two separate occasions—first to HR and then in response to the company president—that Daybreak was "violating the law" by not paying Vincent for travel time or overtime.

Despite Starnes unequivocally expressing the view that her employer was violating the law, the district court concluded that her conduct did not involve stepping outside her role as Risk Manager. It relied on the Job Description dated October 25, 2010, which states that Starnes investigates and reports to President Rich all violations of federal and state law, including FLSA violations. But factual disputes surrounding whether the Job Description applied at the time Starnes made her report to HR make it an inappropriate

---

gives fair notice, and our manager rule "likely are consistent." *Rosenfield*, 811 F.3d at 287. And we have continued to apply the language both from *Hagan* and *Kasten* consistently. *See Lasater*, 495 F. App'x at 461.

vehicle to warrant judgment as a matter of law.  Starnes stated that she alerted Shelton to Vincent's wage issue as early as late October 2010; thus, her report may have been made before Daybreak even created the Job Description.  There is no evidence about when the new description was delivered to Starnes, and Starnes did not even sign it until March 2011—several months after her initial report.  Daybreak points out that she did not object to the description, but that does not rule out that it contained new responsibilities.  Indeed, the earlier created Job Analysis does not mention reporting violations of law.

Other evidence reinforces the view that there is a genuine dispute about whether reporting FLSA violations was part of Starnes's duties.  Aside from the Vincent Estrada situation, Starnes never dealt with a pay issue during her tenure as Risk Manager.  Her primary responsibility involved insurance and workers compensation claims.  And Starnes's conduct in handling the Vincent Estrada issue corroborates her testimony about her responsibilities.  She did not consider the FLSA dispute to be part of her duties, first telling Ludy to take the issue to HR.  When Ludy was afraid to do so, Starnes agreed to talk with HR.  She did not take the issue directly to President Rich, which is what the Job Description says she should do with compliance issues within her bailiwick.  Starnes's conduct thus reflects what is typically the case in sizable companies: a separate HR department handles pay issues.

Unlike the dispute in this case about whether Starnes had any responsibility for pay issues, the plaintiffs whose cases were dismissed at the summary judgment stage because they were acting in a "managerial role" indisputably dealt with pay issues.  *See Lasater*, 495 F. App'x at 459, 462 (Director of the Office of Financial Aid and Scholarships "had the obligation and the discretion and authority to keep the accumulated comp hours of her employees[, which were awarded as a substitute for overtime pay] below the prescribed level" to ensure compliance with the FLSA and university policy);

*McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1481 (10th Cir. 1996) (Personnel Director responsible for "monitoring compliance with," among other employment issues, "wage and hour laws"); *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 101 (1st Cir. 2004) (engineer who had to approve security guard's "invoices for payment");[5] *Miller v. Metrocare Servs.*, 2015 WL 477233, at *1, *6 (N.D. Tex. Feb. 5, 2015) (HR Director responsible for ensuring compliance with employment laws).

Another feature of those cases helps further delineate the line between the unprotected act of "assist[ing] the company in complying with its obligations under the FLSA" and the protected act of advocating for a coworker. *Hagan*, 529 F.3d at 627. All of the cases just cited involved the plaintiff raising concerns about the classification of all workers or entire categories of workers. *See McKenzie*, 94 F.3d at 1481, 1486–87 (Director complained about the company's failure to pay overtime to employees); *Claudio-Gotay*, 375 F.3d at 102 (plaintiff raised concerns about the guards not being paid overtime); *Miller*, 2015 WL 477233, at *1 (HR Director reported that the case management employees had been misclassified as exempt from the FLSA). That desire for full compliance with the law for all workers is what one would expect from a manager "concerned with protecting" his employer. *Claudio-Gotay*, 375 F.3d at 102. In contrast, Starnes's concern was only about Vincent—even though other maintenance workers were subject to the same

---

[5] Like *Hagan*, *Lasater, McKenzie*, and *Claudio-Gotay* are also cases in which the employee raised only a "concern" about liability or policy and did not make a definitive allegation of illegality as Starnes did here. *See Lasater*, 495 F. App'x at 460 (plaintiff brought up "concern[s]" about employee comp time violating university policy during a routine audit); *McKenzie*, 94 F.3d at 1481 (plaintiff expressed "concerns about the company's possible FLSA violations"); *Claudio-Gotay*, 375 F.3d at 102 (plaintiff was "concerned with protecting [the company], not asserting rights adverse to [it].") Allegations of illegality are more indicative that an employee is acting adversely to his employer than are concerns about liability.

pay policies (thus the reclassification)—and is thus more akin to "asserting rights adverse" to the company, *id.*, by advocating "on behalf of [another's] statutory rights." *Hagan*, 529 F.3d at 630.

We thus conclude that there is a factual dispute about whether Starnes was stepping outside her ordinary role as Risk Manager and giving fair notice to Daybreak that she was asserting rights adverse to it.

## B.

That brings us to the second reason why the district court found Starnes could not establish a prima facie case: its conclusion that she could not establish a causal link because of significant passage of time—more than a year—between her protected activity and termination. That ruling is consistent with the closeness our case law requires when proximity between the protected activity and adverse action alone is being used to establish causation. *See, e.g.*, *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir. 2002) (holding that temporal proximity alone furnished insufficient evidence of causation to withstand motion for judgment as a matter of law when five months had elapsed). That timing is often all that plaintiffs can point to in trying to establish causation.

But looking solely at temporal proximity in this case, when nearly identical evidence of pretext was found sufficient to allow Ludy to establish a fact issue on the ultimate question of causation, is the "rigid, mechanized, or ritualistic" application of *McDonnell Douglas* that the Supreme Court has warned against. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512[6] (2002)

---

[6] Indeed, federal courts' use of *McDonnell Douglas* has become so habitual that its evidentiary framework has been improperly treated as a pleading standard, *see Swieriweicz*, 534 U.S. at 511 (holding that a plaintiff need not plead a prima facie case as *McDonnell Douglas* sets forth a framework for evaluating evidence), and jury instruction, *see Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir. 1992) (explaining that jury should not be instructed using *McDonnell Douglas* standard).

No. 15-41341

(quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)); *see also Gee v. Principi*, 289 F.3d 342, 346 n.3 (5th Cir. 2002) (explaining that temporal proximity is "part of [the] analysis, but not in itself conclusive" in establishing the causal link for retaliation (quoting *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir.1992)).   Under that framework, the causation requirement for the prima face case is considered at the initial *McDonell Douglas* stage, with pretext evidence being evaluated at the separate final stage.   But the big picture is that both the "causal link" of the prima facie case and the pretext inquiry are aimed at the ultimate question in a retaliation case: "whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in" protected conduct.   *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996); *see also McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (describing the ultimate inquiry as whether there is sufficient "evidence from which the jury may infer that retaliation was the real motive").   The difference is that the prima facie inquiry is the "much less stringent" causation standard. *Long*, 88 F.3d at 305 n.4.  We thus recently recognized in the analogous burden-shifting framework of First Amendment retaliation claims that when plaintiffs had produced pretext evidence indicating that their employer's reason for terminating them was false, they had necessarily satisfied the causation element of the prima facie case.  *See Bosque v. Starr Cnty., Tex.*, 630 F. App'x 300, 304–05 (5th Cir. 2015) (explaining that "attempting to cabin pretext evidence into the third prong is contrary to other precedent and commonsense").

Likewise here, the evidence that the district court found could allow a finding of pretext for Ludy Estrada—that only she and Starnes, the two individuals complaining about the FLSA violations, were permanently let go —also helps establish the "less stringent" causation element of the prima facie case.  If a jury could disbelieve that Daybreak fired Ludy and Starnes for cost-

cutting reasons, then that would be proof of a retaliatory motive. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

And even when it comes to timing, we have recognized that the prima facie case does not rigidly consider only one form of temporal connection. *See Gee*, 289 F.3d at 347 (holding that highly critical comments made about plaintiff by her former harasser and others with knowledge of the harassment at selection meeting—over *two years* after her harassment complaint— indicated a causal connection between her nonselection for the position and her protected activity when meeting and nonselection occurred about a month apart). Although Starnes was terminated more than a year after she engaged in protected activity, the termination occurred just ten days after Daybreak paid $40,000 to resolve the problem Starnes raised. The time when funds have gone out the door may be when the retaliatory impulse is strongest. The termination also came within a month of the meeting between Rich and Ludy, in which Rich heatedly blamed Starnes for the dispute over Vincent's pay.

We thus find that Starnes has established the causal link required to establish a prima facie case.[7]

---

[7] Daybreak argues Starnes is unable to establish the causal link for another reason. It contends that Wallace, Daybreak's Chief Financial Officer, terminated her, not Rich. This means, in its view, there is no evidence Wallace knew about Starnes's reporting of the Vincent Estrada wage issue. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000) (explaining that the final decisionmaker must be aware of the protected activity or he must have been improperly influenced by someone with retaliatory intent). In evaluating Ludy Estrada's claim, however, the district court found a factual dispute concerning who terminated her. We agree with that assessment of the evidence and find there is a similar dispute as to who terminated Starnes. As the district court noted, there is evidence that Rich sent out the email announcing which positions were to be eliminated and personally signed both Plaintiffs' termination letters. Although Daybreak cites Wallace's affidavit, in which he states that the termination decision was made solely by him, the parties' competing stories

No. 15-41341

## C.

For many of the reasons just discussed, the same evidence that supported the district court's pretext ruling as to Ludy Estrada also establishes sufficient evidence from which a jury could conclude that Daybreak's reason for firing Starnes (financial problems related to Medicaid reimbursement cuts) was a pretext for retaliation. *See Hagan*, 529 F.3d at 624. Most compelling to the district court was that Starnes and Ludy—the two employees who reported the alleged FLSA violation—were the only employees permanently let go who wanted to stay at Daybreak. Daybreak counters by arguing that it never filled either woman's eliminated position. That may be so, and a jury may agree that cost-cutting was the true motivation. But a reasonable juror could also find to the contrary, especially given that the amounts paid for bonuses in 2011 and the partners' repeated assurances as late as the fall of 2011 that there would be no need for layoffs paint a different financial picture.

## III.

We next consider the district court's decision to grant a Rule 12(b)(6) motion to dismiss the request in Starnes's complaint for emotional damages if she were to prove a violation of the FLSA. Until recently, we had never directly confronted this question, *see Adams v. Cedar Hill Indep. Sch. Dist.*, 2014 WL 66488, at *6 (N.D. Tex., Jan. 8, 2014) (noting that "[t]he Fifth Circuit has not squarely addressed" this question), and district courts in our circuit were split on the answer. [8] While this appeal was pending, however, an opinion issued

---

demonstrate that there is a fact issue as to who terminated Starnes. Our review of the evidence also indicates a dispute about whether, assuming Wallace was the decisionmaker, he had knowledge of Starnes's conduct before she was terminated. And it is undisputed that Rich had such knowledge.

[8] *Compare Little v. Tech. Specialty Prods., LLC*, 940 F. Supp. 2d 460, 479 (E.D. Tex. 2013) (holding that emotional distress damages are available under the FLSA) *and Saldana v. Zubha Foods, LLC*, 2013 WL 3305542, at *6 (W.D. Tex., June 28, 2013) (same) *with Douglas v. Mission Chevrolet*, 757 F. Supp. 2d 637, 639–40 (W.D. Tex. 2010) (holding that

No. 15-41341

holding that a retaliation victim may recover emotional distress damages under the FLSA. *Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062 (5th Cir. 2016). In accord with *Pineda*, we conclude that the district court erred by dismissing Starnes's request for emotional damages.[9]

## IV.

In its motion to dismiss, Daybreak also challenged the sufficiency of the claim Starnes asserts under section 260A.014(b) of the Texas Health and Safety Code. That section is located in the subtitle dealing with "Licensing of Health Facilities" and the chapter entitled "Reports of Abuse, Neglect, and Exploitation of Residents of Certain Facilities." TEX. HEALTH & SAFETY CODE ch. 260A. It provides a cause of action to employees who experience:

> retaliat[ion] . . . for reporting to the employee's supervisor, an administrator of the facility, a state regulatory agency, or a law enforcement agency a violation of law, including a violation of Chapter 242 or 247 or a rule adopted under Chapter 242 or 247, or for initiating or cooperating in any investigation or proceeding of a governmental entity relating to care, services, or conditions at the facility.

*Id.* § 260A.014(b).

---

emotional damages are not available under the FLSA); *Adams*, 2014 WL 66488, at *7 (N.D. Tex. Jan. 8, 2014) (same).

[9] Daybreak argues that *Pineda* did not address its argument that the general "legal or equitable relief" language of the remedy provision is limited by the examples that follow: "reinstatement, promotion, and the payment of wages lost." 29 U.S.C. § 216(b). Because the listed remedies target economic harm, Daybreak contends this *ejusdem generis* canon—meaning words should be interpreted to be "of the same kind"—precludes allowing emotional damages under the general language. Even if we could use this argument to reconsider *Pineda*, Daybreak misapplies this canon. It applies when "general words follow[] an enumeration of two or more things," not to a statute like this one that starts with the general and follows that with specifics. ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199, 203-205 (2012). Another canon is actually implicated because the section 216(b)'s specific examples are preceded by the phrase "including without limitation": "the verb *to include* introduces examples, not an exhaustive list." *Id.* at 132-33 (emphasis in original) (noting this canon is reinforced when "without limitation" in included).

14

No. 15-41341

We agree with the district court's conclusion that "a violation of law" in this statute is limited to violations related to abuse, neglect, or exploitation of residents at a covered facility and thus does not include whistleblowing on pay policies. The subtitle and chapter title support that view. *See* TEX. GOV'T CODE § 311.023 ("In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the . . . title (caption) . . . ."). So do the surrounding provisions in the chapter which address, among other issues related to health facilities, requirements and immunities for reporting acts that might impair the welfare of residents and criminal penalties for failing to make such reports.[10]  *Id.* §§ 260A.001–017; *Black v. Am. Bankers Ins. Co.*, 478 S.W.2d 434, 437 (Tex. 1972) (noting that "[i]t is a cardinal rule of statutory construction that all sections, words and phrases of an entire act must be considered together . . . and [that] one provision will not be given a meaning out of harmony or inconsistent with other provisions, although it might be susceptible of such construction if standing alone.")  We recognize, moreover, that it would make little sense for the legislature to carve out special protection for wage-and-hour whistleblowers in nursing homes, but not employees of other industries. TEX. GOV'T CODE § 311.023 (allowing courts to consider the "consequences of a particular construction" in construing a statute). For these reasons, it is not surprising that not a single Texas court has adopted Starnes's broad reading of the statute. *McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 474 (5th Cir.

---

[10] Starnes argues that the surrounding provisions support her broad interpretation of "violation of law." In support, she cites the incorporation of federal law as part of the minimum standards by which Texas nursing homes are required to operate and to the requirement that compliance with applicable federal standards must be shown to obtain a license. HEALTH CODE §§ 242.001(b), 242.032(c)(2). But these provisions do no more than reinforce the obvious point that simultaneous compliance with federal and state law is required—they do not broaden the cause of action created under section 260A.014.

15

2015) ("[O]ur duty is to apply existing state law, not create it."). We thus affirm the holding that the state statute does not provide protection to employees reporting FLSA violations.

**\* \* \***

We AFFIRM the district court's dismissal of Starnes's claim for relief under Texas Health and Safety Code section 260A.014, but we REVERSE the judgment with respect to Starnes's FLSA retaliation claim and her request for emotional damages. The case is REMANDED.