315 So.2d 69 (1975)
Lonnie Kenneth LLEWELLYN, Plaintiff-Appellant,
v.
LOOKOUT SADDLE COMPANY et al., Defendants-Appellees.
No. 12614.
Court of Appeal of Louisiana, Second Circuit.
June 4, 1975.
*70 William B. Lynch, James M. Bullers, Bossier City, for appellant, Lonnie Kenneth Llewellyn.
Mayer, Smith & Roberts, by Alex F. Smith, Jr., Shreveport, for appellee, Lookout Saddle Co.
Lunn, Irion, Switzer, Johnson & Salley, by Charles W. Salley, Shreveport for appellees, Farragut Enterprises, Inc. and Aetna Casualty & Surety Co., third party defendants.
Before BOLIN, DENNIS and MORRIS, JJ.
DENNIS, Judge.
This is a suit for damages as a result of personal injury sustained by plaintiff when he fell from his horse allegedly due to a defective girth buckle. Made defendants were Topps Milling Company, Inc., a Bossier City retail western store, and one of its suppliers, Lookout Saddle Company, Inc., a Tennessee corporation. Lookout filed a third party petition against Farragut Enterprises, Inc., a Tennessee corporation, and its insurer, Aetna Casualty & Surety Company. Prior to trial, suit against Topps was dismissed with prejudice. After a trial, the district judge concluded that plaintiff had failed to prove *71 that his injury was caused by a defective girth buckle, and judgment was rendered rejecting his demands. From this judgment plaintiff appealed.
Farragut purchased girth buckles from a Japanese firm not made a party to this suit. Employees of Farragut wove rayon material together with the buckles in such a fashion as to make a completed girth strap with a buckle on each end. These completed girths were shipped to Lookout as well as to other suppliers. Lookout then filled orders for girths as they were received from retailers such as Topps.
The girth with the buckle in question was purchased by Lonnie Llewellyn, plaintiff, from Marion Reeves, president of Topps, on December 3, 1970, after Reeves had shown him a picture of the girth in a brochure or catalogue published by Lookout. Llewellyn and his son used the girth without difficulty until October 29, 1971, at which time plaintiff fell from his horse while riding in Bossier Parish and sustained fractures of his elbow and wrist.
Lookout and Farragut strenuously contend that plaintiff failed to prove that the girth buckle which allegedly caused his injury was defective, or that Lookout was the manufacturer of the buckle and amenable to liability for its latent defects. Farragut also seriously argues that plaintiff failed to prove that the buckle in question was purchased by the retailer Topps from Lookout. These are formidable defenses, but the trial judge pitched his decision primarily on the plaintiff's failure to prove to a probability that the accident was caused by a defect in the girth buckle. We find no manifest error in his decision. Therefore, we will assume arguendo that Lookout was a manufacturer and that it sold the girth and buckle to Topps. We will discuss only whether the plaintiff proved that his injuries were caused by a defective condition of the girth buckle.
The applicable legal principles in manufacturer's liability cases are as follows:
A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect. Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971) (citing numerous authorities).
If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them. Weber v. Fidelity & Casualty Insurance Company of New York, supra (citing numerous authorities).
The plaintiff's burden is to prove causation by a preponderance of the evidence. This burden may be met by direct or by circumstantial evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation. Weber v. Fidelity &, Casualty Insurance Company of New York, supra; Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (1963).
The only evidence that the plaintiff's injury in the instant case was caused by reason of a defective girth buckle is contained in the testimony of the plaintiff and one expert witness. The pertinent *72 portions of Llewellyn's testimony, which bear upon this issue, read as follows:
"Q Let me call your attention to the events that occurred on or about the 29th of October, 1970. Would you describe to the court what your activities were on or about the afternoon or evening of that day?
"A After riding back home from work that evening, my son and I had saddled our horses and gone out for a ride. After riding approximately one hour, I started returning to the stable area. At some distance short of the stable area, approximately 300 yards, I don't know the exact measurements, in the pasture, he had parted company, going to the left as I headed to the right to return to the stable area, he was returning back up to the house where we kept his saddle and tack. I was going back to the tack room, since I had an older saddle, to return my saddle to the tack room. The reason he was not returning his, he had a new one and previous to this date, our tack room had been broken into and all the saddles were stolen so to protect the property, we were at that time keeping his gear at the house. As I was returning after we parted company and as I continued back to the stable area, I approached an open ditch, drainage ditch is approximately 30 feet across. An anticipation of arriving there, I started slowing my horse down. The first time I pulled on the reins to give a command to slow down and to whoa, she startedto stop. At this time, for some unknown reason to me, at that time I started sliding up on her neck and at this time the reins relaxed and she was once again in a full gallop. I could see that culvert coming up and I was holding on as best I could and about this time, I started losing my balance to the right and between her front hoofs and that culvert, I elected to push off to the right. Landing on my right side and rolling over on the ground. The ground was quite hard due to the fact there hadn't been any rain and after making one or two rolls, I don't know how many at that time, I went to get up, put my left arm out and apparently I was still rolling and that's when I broke my left arm. When I got up I could not hold my right arm up. Even before I was completely up, a neighbor who had been out jogging, come running up, Major John Swartz, and about the same time he arrived, my son came back. I instructed my son to go get my wife and he assisted me over to the road and by the time we got to the road, my wife was there to pick me up and took me to the base hospital at Barksdale.
"Q Had you had prior horse riding experience, prior to the date of this fall?
"A Yes I had.
"Q Would you describe that experience for the court please?
"A The accident happened in October of 1971. I had originally purchased the horse in December of 1970, so I had had this horse approximately 10 months. Prior to this time, I did not have extensive experience of riding a horse, however, I have owned horses in the past and had ridden horses for some time.
* * * * * *
"Q Did you later examine the buckle after the accident?
"A Yes.

*73 "Q What did your examination show?
"A As to the photos there, the buckle on one end was obviously not the same as the other.
"Q And what was the difference?
"A Half of the cross bar to the buckle was broken and that's the only way thing that you could see that was not the same as the other.
"Q On the buckle that the cross bar broke on, which side of theor which buckle was this? Was this the one that you had removed the tongue or not removed the tongue?
"A I didn't understand the question.
"Q On the buckle thaton your examination when you showed that the cross bar was broken on one of the buckles, was the buckle that it was broken on the one that you had removed the tongue from or had not removed the tongue from?
"A Had not removed the tongue from.
* * * * * *
"Q What happened to this horse that you fell off of after you fell?
"A We kept the horse.
"Q Well I mean what happened after you fell that day. Did he stop right there or did he run off to the barn?
"A No, he went off to the barn.
"Q And did the saddle fall off on you or with you or what?
"A I don't know what happened with it. Later on I was informed
"Q No, no.
"A It wasn't laying with me by the ground."
The testimony on direct examination of Gary G. Paulson, a ceramic and metallurgical engineer, which was taken by deposition, indicated that the buckle in question was more brittle than normal. Paulson expressed the opinion that the buckle broke "due to a sharp impact type load."
However, on cross-examination he admitted that the tests upon which he based his conclusions were not performed on the buckle which broke but on the buckle at the other end of the girth. In reaching his conclusions he had assumed that both buckles possessed identical qualities. Yet he acknowledged that the two buckles, which were mass produced, could vary substantially unless they had been cast on the same day by the same person, under identical conditions. The evidence failed to show that the buckles were made at the same time. Furthermore, Paulson ultimately admitted that his opinion as to causation of the buckle's fracture had been based in part on facts supplied by the plaintiff's attorney. Assuming that his tests were fully applicable to the broken buckle, he conceded the possibility that the buckle failed due to trauma or a blow received from another object. In our opinion, the upshot of his testimony is that the probable cause of the buckle's failure could not be determined by his testing and analysis alone. Thus the testimony of plaintiff's expert presents no more than a possibility that the buckle in question was defective, or that its fracture was caused by the ordinary stresses of horse-back riding.
Significantly absent from the evidence is any indication of when or by whom the broken buckle was initially discovered. Llewellyn's son and a neighbor came to his aid immediately after the accident, but he inexplicably did not call either as a witness. Plaintiff testified that he examined the buckle after the accident, but the record does not establish the date of his examination, except that it probably followed his release from the hospital ten or eleven days after the accident. Since the saddle did not come off when Llewellyn fell or jumped from the horse, there is a definite possibility the buckle was damaged by the *74 riderless animal as it ran to the barn or even later. Because plaintiff failed to give specific information relating to the discovery of the broken buckle, and failed to call as witnesses the persons who most likely would have unsaddled the horse after the accident, we are forced to consider the possibility that the buckle was tampered with before it was introduced into evidence. In fact, plaintiff did not actually testify that the saddle slipped or caused him to fall off. His words were "I started sliding up on [the horse's] neck. . . . I started losing my balance. . . . I elected to push off to the right. . . ." The plaintiff had owned the horse for only ten months and did not have extensive riding experience. This and the fact that the accident occurred when the horse approached a large 30 foot wide drainage ditch present the possibility that plaintiff's inexperience and his mount's sudden stop could have caused him to become unseated.
The doctrine of res ipsa loquitur is not applicable, contrary to plaintiff's contentions, because the girth had been in the possession of plaintiff, or members of his family, from the date of its purchase on December 3, 1970, until the accident occurred in October, 1971. When not in use it was kept in a common area with the gear of other riders, and during the ten month period it was regularly stored there, approximately sixteen families had access to the storage area.
The jurisprudence of Louisiana is well settled with regard to the general rules regarding applicability of the doctrine of res ipsa loquitur, one of which is that the agency or instrumentality which causes the injury or damage must have been within defendant's control. Langlinais v. Geophysical Service, Inc., 237 La. 585, 111 So.2d 781, and cases therein cited. Miller v. Otis Elevator Company, 154 So. 2d 629 (La.App., 3d Cir. 1963).
After considering the evidence, we conclude that the trial judge was not manifestly erroneous in finding that the plaintiff failed to prove by a preponderance thereof that his injuries were caused by a defective girth buckle. We are mindful that the plaintiff is not required to negate all other possibilities. Taken as a whole, the circumstantial evidence presented by plaintiff does not exclude other reasonable hypotheses with a fair amount of certainty.
Therefore, the judgment below rejecting the plaintiff's demands is affirmed at his cost.
Affirmed.