# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 16, 2012

No. 10-31264

Lyle W. Cayce
Clerk

THOMAS ALLEN MCDANIEL,

Plaintiff–Appellant

v.

TEREX USA, L.L.C., doing business as Terex Drills, formerly known as Terex Reedrill,

Defendant–Appellee

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:09-CV-01721

Before BENAVIDES and PRADO, Circuit Judges, and ALVAREZ,[*] District Judge.

EDWARD C. PRADO, Circuit Judge:[**]

Plaintiff–Appellant Thomas Allen McDaniel brought this products liability action against Defendant–Appellee Terex Drills ("Terex") for injuries he suffered when a drill bit, attached to an auger drill, crushed him. McDaniel had moved under the drill bit to pull out a stake, whereupon—according to McDaniel—the

---

[*] District Judge of the Southern District of Texas, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-31264

drill operator inadvertently activated a mechanism known as the inner kelly float pedal, which caused the bit to free fall onto McDaniel.  McDaniel sued under the Louisiana Products Liability Act ("LPLA"), arguing (i) that the drill was defectively designed because the inner kelly float pedal, positioned near the operator's feet and poorly guarded, was susceptible to inadvertent activation, and (ii) that Terex had inadequately warned against the hazard created by the poorly-positioned, poorly-guarded pedal.  The case proceeded to trial, and after McDaniel presented his case on liability, the district court granted Terex's Rule 50(a) motion for judgment as a matter of law.  For the reasons provided below, we AFFIRM the district court's judgment with respect to McDaniel's inadequate warning theory of liability, but REVERSE the district court's judgment with respect to McDaniel's design defect theory of liability.

## I.  BACKGROUND

### A.  Factual Background

Terex manufactures the Texoma 800, a truck-mounted auger drill.  Several features of the Texoma 800 are noteworthy.  The drill operator of the Texoma 800 sits on a swivel chair that is attached to an elevated platform located at the rear of the machine.  While seated, the operator can drop the drill bit using either (i) a hand-lever on the control panel in front of him or (ii) a device known as the inner kelly float pedal, affixed to the platform on which his feet rest.  The hand-lever enables the operator to raise or lower the inner kelly bar—to which the bit is attached—in a controlled fashion.  The float pedal, however, is designed to allow the operator to bypass such deliberate, manual maneuvering.  Depressing the pedal will release the tension on the cables that hold up the inner kelly bar, thus allowing the bit to "float" in the hole being drilled.  If the pedal is depressed while the bit is above ground, however, the inner kelly bar and the attached bit will fall free; by depressing and holding down the pedal with his foot, the operator will cause a bit that is suspended above ground to

2

crash to the ground. As soon as the operator lifts his foot, the inner kelly bar and attached bit will stop falling. Although the float pedal is positioned between two metal bars, there is no cover over it.

It is also noteworthy that the Texoma 800 comes equipped with numerous warnings and instructions. A hodgepodge of warnings and instructions are fastened to the operator's control panel. One placard warns: "WARNING: THE AREA WITHIN 15 FEET OF THE KELLY BAR OR MAST IS POTENTIALLY HAZARDOUS AND MUST BE KEPT CLEAR OF PERSONNEL WHENEVER POSSIBLE. FAILURE TO HEED THIS WARNING MAY RESULT IN BODILY INJURY FROM FLYING OBJECTS OR FALLING INTO THE EXCAVATION." Another placard warns: "INNER KELLY FLOAT PEDAL[:] DO NOT FREE FALL." Yet another placard warns: "BE SURE THE IMMEDIATE WORK AREA IS CLEAR [AND] ALL BYSTANDERS ARE AT LEAST 20 FEET AWAY BEFORE STARTING ENGINE OR OPERATING MACHINE." And: "SWING AREA[;] KEEP CLEAR." The operation and maintenance manual for the Texoma 800, too, contains warnings and instructions. One warning in the manual states: "The 'Inner Kelly Float Pedal' control is not to be used as a free-fall devise. Operation of this devise as a free-fall function can cause serious injury." The manual also warns: "Do keep the area within 15 feet of the Kelly Bar clear of personnel." And: "Keep all personnel at least 15 ft. (4.5 m) from the Kelly Bar when it is operating."

On September 10, 2008, the day of the accident, McDaniel was a ground-person on a three-man drilling crew for Lone Star Drilling Services ("Lone Star"). The crew was preparing to drill a cellar hole with a Texoma 800. The location of the planned hole was marked by a stake—a metal T-post. According to the testimony at trial, once the team centered the drill bit over the stake, the drill operator—Justin "Judd" Mims—instructed McDaniel to pull the stake from the ground. McDaniel testified that he shouted to Mims to "hold up," and then

reached under the bit in an attempt to pull out the stake with one hand. When he could not remove the stake with one hand, he crawled under the bit and attempted to remove the stake with both hands. Mims testified that while McDaniel was attempting to remove the stake, Mims was not looking at him, but was instead looking at the drill's mast to ensure that the machine was level. While McDaniel was under the bit attempting to remove the stake, and while Mims was looking away, the bit fell onto him. McDaniel testified that just before the bit fell onto him, from the corner of his eye, he saw Mims's "feet rotating" as Mims "turned in the seat." Brandon Woods, the third crew member, yelled to Mims to "pull up." Mims complied, pulling up the bit and swinging it aside.

Mims testified that he did not know what caused the bit to fall onto McDaniel, and that he did not know whether his foot had inadvertently hit the inner kelly float pedal. He also testified that the particular Texoma 800 that had injured McDaniel would often malfunction. According to Mims, "sometimes," "every now and then," the bit on that particular machine would "unexpectedly" fall to the ground, even though he had not "touch[ed] anything." Mims further testified that he had lodged "several" reports about the propensity of that Texoma 800's bit to fall, and that in response, mechanics had inspected and fixed the machine "several times." Furthermore, Mims testified that the day after the accident, he tested the machine, confirmed that it was working, took the machine to a job site, and completed a job.

Mims could not recall whether he had ever before inadvertently activated the pedal with his foot. Sanders testified that as operator, he would often "catch [himself]" inadvertently striking the pedal with his foot. He added that such inadvertent striking would happen "at least once" "on every job." When that happened, the bit would fall two or three feet, depending on his reaction time.

Also at trial, although McDaniel acknowledged that the crew might have executed another procedure to remove the stake—such as removing the stake

before the drill bit was raised, and then marking the spot—McDaniel insisted that the crew's procedure that day was "standard operating procedure." He testified: "[T]hat was the standard operating procedure with every single employee at that shop, as well as other companies that do the same work." Additionally, McDaniel testified that ground-personnel would routinely get underneath the drill bit to "change the teeth" of the bit. The drilling process would break and distort the teeth of the bit; to fix the bit, the bit would be raised and ground-personnel would get underneath it to hammer out and weld broken teeth. McDaniel explained that these tooth changes were "standard operating procedure" and occurred "daily": "You may go one or two days without having to change teeth, but generally in the East Texas area and western Louisiana, [given] the soil composition, you would have to change teeth daily. Sometimes three or four times a day." Another witness—William E. Sanders, a former ground-person and operator at Lone Star—likewise testified that ground-personnel would routinely go underneath suspended bits to change teeth.

Although McDaniel conceded that he had been trained not to go under a suspended load, he stated that he had not been trained not to go under a suspended bit. But McDaniel confirmed that, at Lone Star, his supervisor Bryan McDaniel had instructed him "in passing" "not [to] go under that bit for [any] reason unless [McDaniel] just absolutely, positively, by no other choice, [had] to." Regarding the Texoma 800's warnings and instructions, McDaniel testified that Terex had never provided him with a copy of the manual. Mims testified that he did not routinely follow the fifteen-foot rule.

McDaniel called Dr. Stephen H. Batzer, a failure analyst and forensic engineer, as his expert witness. Batzer testified that the machine was defectively designed and unreasonably dangerous because the inner kelly float pedal was not fully guarded. According to Batzer, the pedal was susceptible to inadvertent activation because it was placed on the platform, where the operator

naturally rests his feet, and which is not clearly visible and easily accessible to him—unlike his control panel.

In addition, Batzer testified that "[i]t is an unreasonably dangerous machine because it is not responding to deliberate but rather accidental inputs by the operator, which is completely preventible in a low-tech, low-cost way. . . . [Y]ou can load a cover over that switch and still operate the machine just fine." As for alternative design, Batzer specified that the design could be made safer by placing an "inverted C-shape guard" or shield over the pedal. According to Batzer, such a design was "industry standard" and would require the operator to "carefully put [his] foot in and elevate it onto the pedal." Batzer also opined that the pedal could be relocated up from the platform.

Batzer was cross-examined about whether the alleged design defect proximately caused McDaniel's injury. Upon being asked whether it was correct that no witness had testified that the pedal had been depressed at any time, Batzer responded that "they said they didn't know, which is different," but agreed that there was no "expression of positive knowledge." Upon being asked—"If [Mims] never touched the foot pedal, your alternative design doesn't prevent this accident, correct?"—Batzer responded, "That's a pretty big 'if,' but that's true." Finally, upon being asked whether it was possible that Mims inadvertently pushed the hand-lever too far, Batzer responded: "That did not happen, to a reasonable degree of engineering probability," and "the probability of that is essentially zero, so no."

## B. Procedural Background

On August 26, 2009, McDaniel filed this LPLA action in the 42nd Judicial District Court, De Soto Parish, Louisiana. McDaniel alleged two theories of liability under the LPLA: first, that the drill was defectively designed because the inner kelly float pedal, positioned near the operator's feet and poorly guarded, was susceptible to inadvertent activation; second, that Terex had

inadequately warned against the hazard created by the poorly-positioned, poorly-guarded pedal.  On October 1, 2009, Terex filed a notice of removal on the basis of diversity.  The case proceeded to a bifurcated trial in the United States District Court for the Western District of Louisiana.   The liability phase commenced on November 15, 2010.  After McDaniel presented his liability case and rested, Terex moved for Rule 50(a) judgment as a matter of law.  The district court granted the motion, observing that McDaniel had failed to adequately show that his use of the drill was reasonably anticipated.  McDaniel appeals that judgment.

## II.  STANDARD OF REVIEW

Because federal jurisdiction in this case is based on diversity, we follow Louisiana's substantive law, but we apply the federal standard of review.  *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3 d640, 647 n.12 (5th Cir. 2002).  We review a district court's grant of judgment as a matter of law de novo, applying the same legal standard that the district court used in first passing on the motion. *McBeth v. Carpenter*, 565 F.3d 171, 176 (5th Cir. 2009).  "A district court may not grant a Rule 50(a) motion unless a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  *Hagan v. Echostar Satellite, LLC*, 529 F.3d 617, 622 (5th Cir. 2008) (internal quotation marks omitted).  A Rule 50(a) motion may be granted only if "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict"; yet, if "reasonable and fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions, the motions should be denied."  *McBeth*, 565 F.3d at 176 (internal quotation marks omitted).  "Under this standard, we view all the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Hagan*, 529 F.3d at 622 (internal quotation marks omitted).  "[I]t is the

No. 10-31264

function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Id.* (internal quotation marks omitted). Although we review the record as a whole, we disregard evidence favorable to the moving party that the jury is not required to believe. *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

While our review is de novo, we have, on occasion, discouraged district courts from granting Rule 50(a) motions, indicating our preference for the practice of submitting the case to the jury and then passing on the sufficiency of the evidence on a post-verdict motion. *See McPhillamy v. Brown & Root, Inc.*, 810 F.2d 529, 532 (5th Cir. 1987) (describing this practice as "highly desirable" and observing that "[t]he primary reason we encourage district courts to reserve judgment on motions for directed verdict is that if the court grants a judgment n.o.v., a retrial is avoided if we reverse the j.n.o.v. because there is a jury verdict that can be reinstated" (citations and internal quotation marks omitted)); *Gomez v. St. Jude Medical Daig Div., Inc.*, 442 F.3d 919, 938 (5th Cir. 2006) (describing this practice as "prudent"); *see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006) ("[T]he district courts are, if anything, encouraged to submit the case to the jury, rather than granting such motions.").

## III.  DISCUSSION

The LPLA sets forth "theories of liability for manufacturers for damage caused by their products under Louisiana law." La. Rev. Stat. § 9:2800.52. A product may be unreasonably dangerous in four exclusive ways, two of which are relevant here: first, a product may be "unreasonably dangerous in design"; second, a product may be "unreasonably dangerous because an adequate warning about the product has not been provided." La. Rev. Stat. § 9:2800.54(B). Under the LPLA, "[t]he manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders

the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La. Rev. Stat. § 9:2800.54(A). We have thus held that a plaintiff asserting a products liability action against a manufacturer faces a two-tiered threshold burden: "the plaintiff must show that (1) his damages were proximately caused by a characteristic of the product that renders it unreasonably dangerous, and (2) his damages arose from a reasonably anticipated use of the product." *Kampen v. Amer. Isuzu Motors, Inc.*, 157 F.3d 306, 309 (5th Cir. 1998) (en banc) (citing La. Rev. Stat. § 9:2800.54(D)).

As discussed below, McDaniel introduced sufficient evidence for a reasonable jury to find that he satisfied the two-tiered threshold burden for his design defect theory of liability; with respect to his inadequate warning theory of liability, however, he failed to introduce legally sufficient evidence.

## A.  Reasonably Anticipated Use

### 1.  Applicable Law

Under the LPLA, a reasonably anticipated use is a "a use or handling of the product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. Rev. Stat. § 9:2800.53(7). As we have explained:

> This objective inquiry requires us to ascertain what uses of its product the manufacturer should have reasonably expected at the time of manufacture. The LPLA's "reasonably anticipated use" standard should be contrasted with the pre-LPLA "normal use" standard; "normal use" included all intended uses, as well as all reasonably foreseeable uses and misuses of the product. "Normal use" also included reasonably foreseeable misuse that is contrary to the manufacturer's instructions.

> It is clear that by adopting the reasonably anticipated use standard, the Louisiana Legislature intended to narrow the range of product uses for which a manufacturer would be responsible. We know that,

under the LPLA, a manufacturer will not be responsible for every conceivable foreseeable use of a product.

*Kampen*, 157 F.3d at 309–10 (citations and internal quotation marks omitted); *accord Payne v. Gardner*, 56 So.3d 229, 231 (La. 2011).

Given the factual similarity of *Kampen* to our case, we look toward *Kampen* to illuminate the issue of "reasonably anticipated use." There, the plaintiff used a factory-supplied tire jack to raise the front end of a car and investigate a noise coming from beneath it. 157 F.3d. at 308. Suspecting that something was caught behind the front wheel, the plaintiff placed his head and shoulders beneath the front of the car to examine the back of the wheel. *Id.* at 309. As the plaintiff was underneath the car, the jack gave way and the car crushed him. *Id.* The plaintiff brought an LPLA action against the jack manufacturer for defective design. *Id.* at 308. Although the plaintiff had not read the owner's manual for the jack, it instructed the user to use the jack only when changing tires and warned the user never to get beneath the car when using the jack. *Id.* at 309.

In analyzing the threshold question of "reasonably anticipate use," *Kampen* began by delineating the scope of the plaintiff's conduct that comprised "use" under the LPLA. *Id.* at 310. If the plaintiff's conduct in jacking up the car constituted his entire "use" of the jack, then the plaintiff's use of the jack would of course be reasonably anticipated—"a manufacturer quite reasonably anticipates his jack to be used for jacking!" *Id.* However, if the plaintiff's "use" of the jack included both (i) his act of jacking up the car *and* (ii) his subsequent act of crawling underneath the car, "then reasonably anticipated use becomes a closer question: manufacturers may or may not reasonably anticipate users of their products to disregard express warnings about the product and thereby place themselves in physical danger." *Id.* (emphasis omitted). We selected the latter conception of "use"—a conception of "use" broad enough to encompass

No. 10-31264

some of the plaintiff's negligent conduct. *Id.* at 311–12. We reasoned:

> [A] plaintiff may act in relation to a product in such a way that, while it does not change the physical stresses placed on a product, nevertheless increases the risk of injury associated with the product. A manufacturer is required to take these kinds of actions by product users into account when designing and providing warnings for its products.

*Id.* We then elaborated:

> [The plaintiff] began using the jack when he elevated the car with it. When [he] finished jacking the car up, however, his use of the jack did not conclude. Thereafter, [he] used the jack by relying on the jack to hold the car in its elevated position. When [he] placed himself beneath the car, he was still using the jack: he was relying on the jack to hold the car above his body."

*Id.* Having defined the scope of the plaintiff's use at a level of generality that included the plaintiff's act of crawling under the car, we found that the plaintiff's use of the jack was not reasonably anticipated. *Id.* at 314. Our reasoning relied on both the warnings and the plaintiff's failure to demonstrate that the operator should have been aware that customers were routinely using its jacks contrary to the warnings. *Id.* We thus held:

> [W]here a manufacturer provides an express warning cautioning against the use of the product for which the product was neither designed nor intended, and where the plaintiff acts in direct contravention of that warning . . . the plaintiff's 'use' of the product will not be a reasonably anticipated one *unless . . . the plaintiffs had presented evidence that despite the warnings, the manufacturer should have been aware that operators were using the product in contravention of certain warnings.*

*Id.* (citations and internal quotation marks omitted) (emphasis added); *see also id.* at 315–18 (emphasizing that, to establish reasonably anticipated use, plaintiff who misuses product must present evidence that defendant knew or should have known that others were similarly misusing the product). Since *Kampen*, it has become well-settled that "plaintiffs who used a product in a

manner that violates clear and express warnings can show that their use was reasonably anticipated only by presenting evidence that the manufacturer had reason to know that these warnings were ineffectual." *Broussard v. Procter & Gamble Co.*, 517 F.3d 767, 770 (5th Cir. 2008). In *Broussard*, for example, although the defendant-manufacturer of a heatwrap warned users not to use the heatwrap on areas of the body that lacked sensitivity to heat, the plaintiff nonetheless used the heatwrap on an area that was insensitive to heat due to a medical condition. *Id.* at 769–70. We rejected the plaintiff's LPLA claim and affirmed summary judgment for the defendant because the plaintiff had "failed to present even one scintilla of evidence that [the defendant] knew or should have known that despite the warnings" consumers were similarly misusing the heatwrap. *Id.* at 770.

## 2. Application

Applying the framework of *Kampen* to our case, we first define the "use" of the drill here to include both (i) the crew's act of using the drill to raise the drill bit and (ii) McDaniel's subsequent act of reaching under the raised bit to pull out the stake—just as the use of the jack in *Kampen* included both the act of using the jack to raise the car and the plaintiff's subsequent act of crawling under the raised car to investigate something behind the wheel. To be sure, McDaniel did not change the "physical stress[]" placed on the machine; by crawling under it, however, he interacted with the machine "in such a way that" he "increase[d] the risk of injury associated with the product." *Kampen*, 157 F.3d at 311. As in *Kampen*, the crew "began using" the drill when they "elevated [the bit] with [the drill]," and McDaniel continued to use the drill "by relying on the [drill] to hold the [bit] in its elevated position"; when McDaniel "placed himself beneath the [drill], he was still using the [drill]: he was relying on the [drill] to hold the [bit] above his body." *Id.* Furthermore, the LPLA does not require that the "use" at issue only involve the plaintiff's conduct. *See* La.

No. 10-31264

Rev. Stat. § 9:2800.54(A) ("The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.")

Although we trace *Kampen*'s delineation of the scope of "use," unlike in *Kampen*, we conclude here that there was legally sufficient evidence that McDaniel's use of the drill was reasonably anticipated. A reasonable jury could have found that it was reasonable for Terex to anticipate that McDaniel would crawl under the drill bit. McDaniel "presented evidence" that Terex should have known that drill users were routinely venturing under drill bits, in contravention of warnings and instructions. *See Kampen*, 157 F.3d. at 314. According to McDaniel, for example, it was normal operating procedure to go under a suspended drill bit to remove a stake. "[T]hat was the standard operating procedure with every single employee at that shop, *as well as other companies that do the same work*." McDaniel also testified that it was normal operating procedure to go under a suspended drill bit to change teeth. In fact, tooth changes occurred daily. Sanders agreed that drill users would routinely venture under the bit for tooth changes, and would partially venture under the bit for stake removals. Even Mims conceded that he did not follow the fifteen-foot rule, because drill personnel needed to be closer to the drill to do their work.

A reasonable jury could infer from this evidence—i.e., the evidence that McDaniel's act of crawling under the drill bit conformed to an industry-wide custom—that Terex "should have been aware" that drill users were using the drill contrary to the warnings and instructions. *See Kampen*, 157 F.3d at 314. This conclusion emerges from the standard of review for a Rule 50(a) judgment, pursuant to which we must view the evidence in the light most favorable to McDaniel. *Hagan*, 529 F.3d at 622.

Indeed, the case for finding reasonably anticipated use is stronger here than in *Kampen* or *Broussard* because of the nature of Terex's warnings and instructions. Unlike the explicit warning relevant to the plaintiff in *Kampen*, the inexact warnings and instructions here did not specifically caution against McDaniel's conduct. For example, although a guidebook instruction warned personnel to stay fifteen feet away from the kelly bar, a placard warned that "failure to heed the warning could result in injury from flying objects or falling into the excavation"—a falling drill bit is not among the listed risks. No warning explicitly stated: "Do not go under a suspended drill bit." And unlike the warnings in *Kampen* and *Broussard*, Terex's warnings were not directed at a person in the plaintiff's position: a ground-man such as McDaniel. Instead, the warnings were directed at the drill operator, as they were placed on his control panel, right in front of him, for only him to see. Terex's warnings are not precise enough to remove—as a matter of law—McDaniel's conduct from the domain of "reasonably anticipated use." That is, Terex's warnings do not preclude a finding that Terex reasonably anticipated that McDaniel would crawl under the bit.

In light of the standard of review, we hold that a reasonable jury could find that McDaniel's use of the drill bit was reasonably anticipated. The jury may have ultimately disagreed, of course; perhaps the argument that Terex could have reasonably anticipated McDaniel's risky crawl was weak. Nonetheless, the argument was not deficient enough to warrant judgment as a matter of law. The issue of reasonably anticipated use should have been left for our presumptively trustworthy, traditional fact-finder: the jury.

## B.  Theories of Liability

Although we have held that McDaniel put forth legally sufficient evidence to satisfy his threshold burden to show reasonably anticipated use, we must still evaluate whether he has put forth legally sufficient evidence (i) to satisfy his threshold burden to show causation, and (ii) to establish the substantive

No. 10-31264

elements of his theories of liability—design defect and inadequate warning. We evaluate each theory of liability in turn, starting first with McDaniel's design defect theory of liability.

### 1. Design Defect Theory of Liability

#### a. Causation

To establish proximate cause under the LPLA, a plaintiff "must prove not only causation in fact, but also that the product defect was the most probable cause of the injury." *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 342 (5th Cir. 1994) (internal quotation marks omitted). "The plaintiff's burden is to prove causation by a preponderance of the evidence." *Llewellyn v. Lookout Saddle Co.*, 315 So. 2d 69, 71 (La. Ct. App. 1975). The plaintiff may satisfy its burden either by direct or by circumstantial evidence. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002) (citing *Joseph v. Bohn Ford Inc.*, 483 So. 2d 934, 940 (La. 1986)). If the plaintiff resorts to circumstantial evidence, the evidence "must exclude other reasonable hypotheses with a fair amount of certainty." *Llewellyn*, 315 So. 2d at 71; *accord Pipitone*, 288 F.3d at 239 (noting that "plaintiff may prove causation by establishing 'with reasonable certainty that all other alternatives are impossible'" (emphasis omitted) (quoting *Todd v. State*, 699 So. 3d 35, 43 (La. 1997)); *Gomez*, 442 F.3d at 936 (noting that plaintiff must "eliminate alternative causes with 'reasonable certainty'"). "This does not mean, however, that [the plaintiff] must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation." *Llewellyn*, 315 So. 2d at 71; *accord Pipitone*, 288 F.3d at 239 (noting that "plaintiff need not absolutely negate all other possible causes of the injury to meet his burden on causation" (citing *Joseph*, 483 So. 2d at 940)).

Here, there was sufficient evidence at trial from which the jury could reasonably find that inadvertent activation of the defectively designed float

pedal was the most probable cause of the accident. McDaniel testified that just before the bit fell on him, from the corner of his eye, he saw Mims's "feet rotating" as Mims "turned in the seat." This testimony should be considered alongside evidence that the pedal was located near Mims's feet, that the pedal was poorly guarded and uncovered, that the pedal was difficult to see, and that the pedal was naturally susceptible to inadvertent activation because it was positioned on the platform, where an operator such as Mims would rest his feet. In such context, McDaniel's testimony is circumstantial evidence that Mims caused the accident by inadvertently activating the pedal when he rotated in his seat. Lending slight support to McDaniel's causal explanation for the accident is Sanders's testimony that, as operator, he would "catch [himself]" inadvertently striking the pedal with his foot "at least once" "on every job." Meanwhile, Mims's own testimony that he did not know how the bit fell is consistent with McDaniel's causal explanation of inadvertent activation. If Mims had mistakenly kicked the pedal, it makes sense that he would not have known that he had done so. At the very least, Mims's testimony does not reduce the probability that Mims inadvertently hit the pedal.

Because McDaniel failed to present direct evidence that inadvertently activating the pedal caused the accident, however, we must determine whether McDaniel adequately undermined alternative explanations for the accident. Given that only the float pedal and the hand-lever control the inner kelly bar, plausible alternative causes for the fall include the following: (i) Mims's deliberate activation of the float pedal or the hand-lever, (ii) Mims's inadvertent activation of the hand-lever, or (iii) an unidentified mechanical failure. Analyzing each alternative cause in turn, we conclude that there was sufficient trial evidence for a reasonable jury to find that McDaniel excluded each alternative cause with reasonable certainty.

First, it is unlikely that Mims deliberately caused the bit to fall. According

16

to the testimony at trial, Mims instructed McDaniel to remove the stake, and McDaniel told him to hold up.  Unless Mims intended to harm McDaniel, for which there is no evidence, there is no reason to believe that he responded to McDaniel's warning by purposefully pulling down the hand-lever or depressing the float pedal.  Mims also stated that he did not remember what had happened, the veracity of which we cannot question; if he had committed a deliberate act, however, he would have remembered doing so.

Likewise, it is unlikely that Mims accidentally pulled down on the hand-lever.  The hand-lever is not susceptible to inadvertent activation; the lever is directly in front of and easily visible to the operator.  Accordingly, when Batzer was asked whether it was possible that Mims inadvertently pushed the hand-lever too far, he responded: "That did not happen, to a reasonable degree of engineering probability," and "the probability of that is essentially zero, so no."

The third alternative cause—a mechanical failure—is trickier to dispatch.  Mims testified that the particular Texoma 800 in question was a fickle machine.  On several occasions while Mims was operator, the bit had fallen unexpectedly, even though he had not "touch[ed] anything."  Mims's testimony thus supports a narrative that contradicts McDaniel's theory of liability—namely, that a mechanical failure, not inadvertent activation of the float pedal, caused the bit to fall.  On the other hand, Mims testified that the day after the accident, Mims tested the machine, confirmed that it was working, took the machine to a job site, and completed the job.  From the perspective of a reasonable juror, this fact could reduce, to some degree, the probability that a mechanical failure caused the accident on the previous day.  What is more, Terex itself never put forward this alternative explanation, either at trial or in its brief on appeal.  Under Louisiana law on causation, "the mere identification by the record of another possibility, although not shown to be causally active" by Terex, cannot defeat McDaniel's causal story.  *See Llewellyn*, 315 So. 2d at 71.

No. 10-31264

Viewing the evidence in the light most favorable to McDaniel, a reasonable jury could find that McDaniel had eliminated, with reasonable certainty, alternative explanations for the accident. We hold that there is legally sufficient evidence that the defective design of the float pedal—which rendered it vulnerable to inadvertent activation—was the most probable cause of McDaniel's injury. While the evidence of causation is not certain to result in a jury finding that McDaniel met his threshold burden of causation, it is not so overwhelmingly deficient as to preclude the possibility that a reasonable jury could find that Mims inadvertently struck the pedal, causing the accident.

### b. Substantive Liability

Under the LPLA, "a product is unreasonably dangerous in design if, at the time the product left its manufacturer's control":

> (1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

La. Rev. Stat. § 9:2800.56. We have held that "[i]n applying the risk-utility analysis, . . . a plaintiff must show evidence concerning the frequency of accidents like his own, the economic costs entailed by those accidents, or the extent of the reduction in frequency of those accidents that would have followed on the use of his proposed alternative design." *Krummel v. Bombardier Corp.*, 206 F.3d 548, 551–52 (5th Cir. 2000) (citing *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 183 (5th Cir.1990)) (internal quotation marks omitted). In *Krummel*, we also observed that "[a] plaintiff may not need to detail and to quantify the risk and utility of a product where the product or the design

18

feature in question is relatively uncomplicated and must be such that a layman could readily grasp them." *Id.* at 552 n.4 (internal quotation marks omitted).

Here, Batzer explained that placing the pedal on the platform floor, near the operator's feet, rendered accidental activation "normal," or inevitable. The platform was a natural place for the operator to rest his feet; the pedal was positioned on the platform; the pedal was difficult to see; and despite the two metal bars near the base of the pedal, the pedal was poorly guarded and uncovered. If the operator lifted his feet and repositioned himself, there was nothing to prevent him from inadvertently striking the pedal as he rested his feet on the platform. Consequently, the pedal was naturally susceptible to inadvertent activation.

Batzer further explained that an alternative design could have resolved this problem and prevented McDaniel's injury: first, Terex could have placed an industry-standard, inverted, C-shaped shield over the pedal; second, Terex could have moved the pedal up from the ledge to the control panel. This alternative design would enhance safety without incurring prohibitive cost or sacrificing utility: "It is an unreasonably dangerous machine because it is not responding to deliberate but rather accidental inputs by the operator, which is completely preventible in a low-tech, low-cost way. . . . [Y]ou can load a cover over that switch and still operate the machine just fine." Batzer opined that there was no reason for the pedal to be placed on the platform floor rather than on the control panel, and that moving up the pedal would not impair its functionality.

In light of the standard of review, we hold that McDaniel's design defect claim survives judgment as a matter of law. This case does not demand a complex, statistical risk-utility analysis. The alternative design here is "uncomplicated" enough for a layman to "readily grasp": either cover the pedal or move it. *See Krummel*, 206 F.3d at 552 n.4. From the testimony admitted at trial, a jury could reasonably find that covering or moving the pedal would

enhance safety without incurring prohibitive cost or sacrificing utility. Again, while the evidence is not certain to result in a favorable jury verdict, it is not so overwhelmingly deficient as to preclude the possibility that a reasonable jury might find that the drill, by virtue of the poorly-guarded and improperly placed pedal, was unreasonably dangerous in design. Accordingly, we REVERSE the district court's Rule 50(a) judgment as a matter of law with respect to McDaniel's design defect theory of liability.

### 2. Inadequate Warning Theory of Liability

To establish LPLA liability for inadequate warning, the plaintiff "has the burden of producing evidence and persuading the jury to find by a preponderance of the evidence that her injury arose from a reasonably anticipated use of the product and that her damage was proximately caused by the lack of an adequate warning." *Calvit v. Procter & Gamble Mfg. Co.*, 207 F. Supp. 2d 527, 530 (M.D. La. 2002) (citing *Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 331–32 (5th Cir. 2001)).

Here, McDaniel failed to introduce *any* evidence establishing a causal link between Terex's failure to adequately warn McDaniel about the hazard created by the defectively designed float pedal and his injury. No witness provided testimony supporting the notion that, but for an inadequate warning, McDaniel would not have crawled under the drill bit and would not have been injured. McDaniel presented no evidence of what additional warning Terex should have provided or how such a warning would have prevented the bit from crushing McDaniel. There was not sufficient trial evidence for a reasonable jury to find that inadequate warning caused McDaniel's injury. Consequently, we AFFIRM the district court's Rule 50(a) judgment as a matter of law with respect to McDaniel's inadequate warning theory of liability.

**AFFIRMED in part, REVERSED in part.**